May it please the Court, my name is Michael Sobel. I represent the appellant, Benjamin Winig. He appeals from a grant of summary judgment dismissing all his claims against his cell phone service provider, Cingular Wireless and the related companies. The appellant claims that Cingular breached their agreement by charging him for his accessing his voicemail from his cell phone. Appellant's cell phone plan entitled him to so-called unlimited mobile-to-mobile minutes. The parties agree that unlimited mobile-to-mobile minutes were to be free of charge under the contract. Appellant further contends that calls dialing his voicemail account were to be treated as mobile-to-mobile minutes and, therefore, also free of charge under his plan. Well, why? I mean, what language leads him to that conclusion? Yes, Your Honor. There are two, there are two. I mean, because mobile-to-mobile, I would think, just in common parlance, you would think of somebody else who's got a cell phone and they're walking around and you call them on it. Well, the contract documents themselves, of course, contain two differing and conflicting definitions of what constitutes a mobile-to-mobile call. It is the definition in a so-called rate plan that should control. The rate plan is the document that sets forth the parties' specific terms of their agreement. And the other contract documents, and they're cited in the record, the wireless service agreement, the welcome kit, the customer service summary, they're documents of general application meant and drafted for application to numerous cell phone plans. Now, those other contract documents do reference the rate plan and actually directs the customer to the rate plan for terms applicable to specific services, including voicemail. You seem to be arguing that the real thing is the rate plan and the main contract is only an addendum, as it were, that applies insofar as it's consistent with the rate plan. Why isn't it the other way around? Why isn't the contract that refers to the wireless service agreement and the wireless service terms the main contract that is supplemented with respect to certain matters by the rate plan? In other words, just kind of the opposite focus. Well, the other contract documents are so general in nature, they actually don't in terms of the services to which a customer subscribes and the fee which singular charges for those services. To do that, you need to look to the rate plan brochure. So you have, for instance, language in the welcome kit and the wireless service agreement as to what kinds of services are, quote, chargeable. Now, the district court took and interpreted the word chargeable to mean this is what will be charged. But that can't make sense under the construction of the documents because when you look at the rate plan brochure, it actually specifies here are the things that we will charge our customers for. So you really need to look to the rate plan brochure. Now, its definition of mobile-to-mobile minutes is calls directly dialing other singular numbers. The other documents, the welcome kit, for instance, defines a mobile-to-mobile call as dialing other singular customers. So you have singular numbers versus singular customers. And the distinction is important because of the evidence that we submitted in front of the district court. All calls to voicemail necessarily involve dialing another singular number. Therefore, as a call to another singular number, it fits right within the definition of the rate plan brochure as a call to another singular number, and therefore should also have been free of charge. You know, that is consistent with what it is that the appellant was represented when he went into the singular store and was asked about it. That is consistent with how Singular itself actually billed the appellant for the first six months of the contract term. All his voicemail calls were labeled mobile-to-mobile. It's also consistent with the experience of numerous other customers nationwide as our responses from the FTC to our Freedom of Information Act requests indicated and which we submitted to the district court. You know, moreover, the appellant here, given the background, had every reason to believe that these mobile-to-mobile calls would include his voicemail. And in fact, what happened was that Singular removed a clarification clause from its contract and actually introduced an ambiguity into the contract. Can I ask you just one, your reaction to one part of the rate? No, I guess this is the customer service summary. The calling, it says, excerpt page 131 at the top, it says, the calling plan for you, Ben Winnig. So there's no argument that this is about somebody else. And it does say, airtime minutes apply when calling. And then there's some other things. Voicemail. Yes, Your Honor. Again, you need to look at all the agreements. And airtime is defined under the wireless service agreement as that which will be chargeable. Chargeable. And so then you come to other parts of the document where you see airtime says incoming calls, outgoing calls, long-distance, voicemail. That's the part that you're looking at right there. But that is, again, conditional language, not exclusive language, which provides the customer absolutely no information as to what will be charged, if anything. And as a matter of fact, a mobile-to-mobile call, Your Honor, can actually be an incoming call, it can be an outgoing call, and it can be a long-distance call. Well, this is without limitation. It just says airtime minutes apply when calling voicemail. There's nothing conditional about that. That's right. And the wireless service agreement defines airtime as chargeable time. But you still don't know what is going to be charged until you look to the rate plan brochure to see the specific terms. That list does not exclude mobile-to-mobile, does not include mobile-to-mobile calls, but incoming calls and outgoing calls actually qualify for mobile-to-mobile calls, just like a voicemail call can qualify as a mobile-to-mobile call. So it actually doesn't provide the consumer with any information. Now, the appellant was migrated as a customer over to Singular only because of a corporate merger between AT&T and Singular in 2004. When he was a customer with AT&T, it was very clear. Voicemail calls were included as mobile-to-mobile calls, and that's how he was filled with them. But what happened when it came time to renew his contract, he needed, of course, to then sign up with Singular because AT&T wasn't there anymore. And when he does, he gets a new contract. Now, given that millions of people are migrating from AT&T over to Singular every month, and given that Singular knows full well that prior AT&T customers are used to getting voicemail free as part of their mobile-to-mobile minutes, and in fact, we introduced evidence in the district court showing internal e-mails that there needed to be clear, more concise disclosure. Well, Singular does just the opposite. They took their old contract that used to have an express disclosure that said voicemail will not count towards mobile-to-mobile, and they took it out of their contract at a time when they should have made a disclosure that should have been absolutely crystal clear. Counsel, if you'd like to save rebuttal time, you have a little over a minute and a half. I will. Thank you. Good morning, and may it please the Court. I'm Seamus Duffy. I represent AT&T Mobility. Thank you for accommodating our schedule back up this morning. I'd like to emphasize at the outset that the grant of summary judgment by Judge Chesney in this case was as to the named plaintiff's individual claim. It was not By way of clarification, Mr. Winning signed up, as Your Honor points out, with Singular. He wasn't migrated by virtue of a merger. He actually signed up with Singular. Mr. Winning, as it happens, is a lawyer himself, and he hired some very good lawyers as well. But what this case shows is no matter how good your lawyers are, and no matter how much discovery is propounded, and no matter how many times you get to change your theory of liability, the contract at the end of the day says what it says. And the law requires what it requires, and Judge Chesney's decision in this case was a straight interpretation of the contract. As Your Honor points out, let me go to the contract, page 150 of the record, which is the wireless service agreement. As Your Honor picked up on, there's an effort in the briefing in this case to elevate a rate plan brochure over and above the actual wireless service agreement in the case. There's no basis for that. Counsel, for six months, you seemed to think that these things were mobile-to-mobile. Your Honor, what happened was, and discovery showed this, when this case was first filed, it was filed on the theory that Your Honor indicates, which was that there was a widespread change in policy at Singular in July of 2005 to begin charging for this. Discovery showed that what actually happened was that there was a network glitch. Customers in California were always charged for voicemail retrieval, but with respect to Mr. Winnig's individual account, the pilot number behind the scenes in our network that was associated with his number and his voicemail retrieval activities wasn't tagged properly. And so he was, those calls were not being recognized as chargeable events. And so when that theory failed, the theory of you changed your policy, what happened in this case essentially was that the plaintiffs went in search of some document they could attach an argument to, and they found this rate plan brochure. But if you look at the contract, as Your Honor points out at page 150, it says, chargeable time may also occur from other uses of Singular facilities, including, by way of example, voicemail deposits and retrievals. So this isn't a case of ambiguity or interpretation. The contract flat out says that voicemail retrieval is chargeable. Well, two things. One is, what is chargeable time? Chargeable time may also occur from other uses of our facilities. Does chargeable time include until some special provision is made, mobile-to-mobile? Your Honor, mobile-to-mobile calls would ordinarily be airtime, would use airtime. And if it weren't for the fact that there was free mobile-to-mobile calling, they would be chargeable airtime. I think if I understand your opponent's argument, it's that, yeah, voicemail is chargeable time, but then we have the rate plan brochure, which says that mobile-to-mobile minutes may be used when directly dialing or receiving calls. Your Honor, let me go right to that. From any number. And, you know, that's — is it your position that the rate plan brochure is no part of the contract? No, Your Honor. At the end of the day, we recognize that we're accountable for every sentence we put in front of our customers. And I think, Your Honor, if they're all read in harmony the way Judge Chesney did it, if every clause is given effect and each is interpreted to help with the next, then this contract all makes perfect sense. If you look at the contract that Mr. Winnig actually received in the mail, and it's got his name on it, as Judge Graber pointed out, it describes mobile-to-mobile minutes as follows. It says mobile-to-mobile minutes are calls to and from other local singular customers in your mobile-to-mobile calling area. Well, that's certainly consistent with your point. And, Judge, that's the common understanding of what in-network free calling is about. It's not about dialing your own voicemail. It's about dialing other people in the network. And so Mr. Winnig says he didn't read his contract. He says it contained a lot of legalese, and even though he's a lawyer, he said, I got bored, and so I didn't read it. And, you know, he doesn't have an obligation to read the contract, I suppose, but at the end of the day, if he doesn't take the time to read it, he shouldn't come to court and try to reform it. But, counsel, when you changed this billing system for Mr. Winnig or began to charge him, what did you tell him? Your Honor, this is not in the appellate record, but Mr. Winnig actually called the company during the first 30 days of his service and asked about this issue. And he was told, you're going to be charged for voicemail retrieval. He was given an accommodation at the time of that call. He was given some free minutes. He was educated about the issue, and they went on. So he was told multiple times, Your Honor. It's not in the record. I don't think it's in the appellate record. It's in the trial record. But I don't know that it was included in the appellate record. Well, the appellate record, there's no separate record. We have before us the entire record. Just because something's not in the excerpt doesn't mean we don't have it and can't consider it. Everything that was before the district court is before us. So it's in the district court then, what you're describing. It is, Your Honor. Okay. Well, then we can listen to you. And what happened in this case is that, at the end of the day, is that the explanation for the billing glitch that happened with Mr. Winnig had to do with these pilot numbers behind the scenes. Okay? And what happened then was that the plaintiffs manufactured an argument out of a rate plan brochure, I want to emphasize, that Mr. Winnig never saw. And they used the words calling, directly calling other singular numbers and said, Aha! The pilot number is an other singular number. Now, Judge Chesney gave all the benefit of the doubt to the plaintiffs here. And she ultimately applied that language really as the governing language. And you know what? I'm prepared to do that, too. Even though his actual contract says otherwise, if you look at the words that they say, get them to the finish line, the answer is they don't, for this reason. And Judge Chesney said it better than I could. She said, if you're calling your own number, which is what Mr. Winnig was doing, you're not calling an other singular number. And if you want to say that the pilot number that you got routed to in the recesses of our network constitutes the other singular number, then you weren't directly calling it. Does he get all his voicemail by adding his own number? Isn't there another route, too? There is, Your Honor. There are numerous ways. You can just hit one and it routes you to it. Okay. I would add, Your Honor, this to what Judge Chesney laid out in her order. I would say even if you assume that the pilot number is an other singular number, and even if you assume somehow that he was directly dialing it, the fact is it's not a singular phone number. It's a singular pilot number. If it was a phone number, it would be assigned to another phone. What is a pilot number? Nobody really explains that. This is different. It's a pilot number. It is confusing, Your Honor. And this is where we ended up having deposition testimony from network engineers. And the lawyers, I think, all maybe had a little bit of trouble keeping up with it. But what it is is it's a table within our network that routes calls and tells the system, tells the billing system how to treat them. And so that's what a pilot number is. It's not something that's visible to the customer. You know, you didn't directly answer my question. You told what apparently happened when the fellow was first getting the service. My question to you was what did you tell him when you changed how you billed him? Your Honor, there was no ñ when the pilot number was fixed behind the scenes, it's not ñ I don't recall, frankly, Judge, from the record, whether there was a specific conversation with Mr. Winnig associated with that change. He had called a few times to ask about voicemail and had been told that it would be charged. But I don't think there was a separate communication with him when we fixed the pilot number in our network. I don't think there was a separate communication with Mr. Winnig. Well, at best, it's not very good consumer relations, is it? Well, Your Honor, I would say this. I would say that our treatment of Mr. Winnig from day one was more than accommodating on this issue, because he called in a couple of times with questions and was educated on this very issue and was given accommodations by the customer service representatives. So I really don't think this is a case individually with Mr. Winnig where he was, as a lawyer, run over by the company and ignored by the company. The company bent over backwards to advise him of what the rules were and gave him accommodations on a couple of occasions. Did you – you mentioned a minute ago that he never received the rate plan brochure. What – what does – what use does it have? I mean, what – why didn't he receive it? Or don't you ever send it to customers? Well, Mr. Winnig received what he received that's in the record that is very explanatory on all of these issues. Because he was going to lose his case on the basis of those documents, he got in discovery other documents that are used in our stores. He bought over the Internet. He didn't buy in a store. And so he built his case around a rate plan brochure that is used – commonly used in stores. And he had that little change in the language from calling other customers to calling other numbers, and that's – that's how the case went. At the end of the day, Judge Chesney properly construed the entire contract, giving – giving force to all of its terms. Under California civil code, she approached the contract interpretation question properly, and her decision should be affirmed. Thank you, counsel. Does the record reflect just – just – this is not relevant – what the bills were running? Pardon me, Your Honor? Does the record reflect what his bills were running at this time? I think there may be some bills in the record, Your Honor. That would have a number on them. Mr. Sobel. Thank you, Your Honor. Let me say first that a pilot number, the uncontroverted deposition testimony revealed, is another singular number. To the extent there's a dispute about the singular phone number, it is a singular phone number. It looks like a regular 10-digit phone number to all of us, and it's a regular phone number. That's what the deposition testimony provided. And the plan that he was provided defined mobile-to-mobile minutes as calls to and from other local singular customers. No. That's not right, Your Honor. I'm looking at page 132, and it says at the top, the calling plan for you, Ben Winnig. And it's just about two-thirds of the way down on the right. Unlimited mobile-to-mobile minutes calls to and from other local singular customers. It does not use the word. I would direct your attention then, Your Honor, to the record at page 136, because these contract documents, including the contract documents that Mr. Winnig received in the mail after he signed up online, contained two different definitions of mobile-to-mobile. And one of them is singular numbers, and one of them is singular customers. It's not true that Mr. Winnig is making a case out of a rate plan brochure that he never received because he didn't sign up in a store. He was sent it in the mail, and that's what it provided. There's a rate term document within the welcome kit, and it contains the definition. There are bills, and, you know, what evidence we submitted in the district court below was that this is resulting in billions of extra minutes for singular that run people's monthly allotment, sends them over, and raises significant revenue for them, and we introduced documents that showed that this was a – this was examined as an effort to generate revenue. So it is of significance. Your Honors, the district court incorrectly interpreted these documents. She found facts on summary judgment when she should not have, and construed all the evidence in the light most favorable to, and drew all inferences in favor of the moving party, and we respectfully submit that her entry of summary judgment should be reversed. Thank you, counsel. We appreciate the arguments that both of you have presented today. And the case just argued is submitted, and we will stand adjourned.
judges: Fletcher B. , Canby, Graber